IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CV-463-D

| | |
|---|---|
| dPi TELECONNECT, L.L.C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| JO ANNE SANFORD, et al., ) | |
| ) | |
| Defendants. ) | |

Plaintiff dPi Teleconnect, L.L.C. ("dPi" or "plaintiff") filed a complaint seeking declaratory and injunctive relief from an order of the North Carolina Utilities Commission ("NCUC") denying dPi's claim for promotional credits from defendant BellSouth Telecommunications, Inc. ("BellSouth"). The defendant Commissioners of the NCUC ("Commissioners"), who are sued in their official capacities, filed a motion to dismiss for lack of subject matter jurisdiction. Thereafter, the parties filed cross motions for summary judgment. As explained below, the court denies the Commissioners' motion to dismiss, grants the Commissioners' and BellSouth's motions for summary judgment, and denies plaintiff's motion for summary judgment.

I.

The Telecommunications Act of 1996 ("1996 Act") regulates local telephone markets and imposes various obligations on incumbent local exchange carriers ("ILECs") to foster competition, including requirements for ILECs to share their networks with competitors. See 47 U.S.C. § 251 et seq.; Verizon Md., Inc. v. Public Serv. Comm'n, 535 U.S. 635, 638 (2002) ("Verizon Md."); MCImetro Access Transmission Servs., Inc. v. BellSouth Telecomms., Inc., 352 F.3d 872, 874-76 (4th Cir. 2003). The duties under the 1996 Act require, inter alia, ILECs to "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4); see BellSouth Telecomms., Inc. v.

Sanford, 494 F.3d 439, 441 (4th Cir. 2007). This resale obligation extends to promotional offerings that last longer than 90 days. See 47 C.F.R. § 51.613.

Plaintiff is a competitive local exchange carrier ("CLEC") certified by the NCUC to provide local telephone service in North Carolina. See Compl. ¶ 4. Pursuant to section 251(c)(4), plaintiff purchases retail services at wholesale rates from BellSouth, an ILEC, and resells the services to plaintiff's residential customers. See id. ¶¶ 5, 10. Pursuant to the 1996 Act, dPi and BellSouth voluntarily negotiated an interconnection agreement, and the NCUC approved the interconnection agreement. The interconnection agreement states, inter alia, that "[w]here available for resale, promotions will be made available only to End Users who would have qualified for the promotion had it been provided by BellSouth directly." R. at 222.[1]

From January 2004 through November 2005, BellSouth offered a Line Connection Charge Waiver ("LCCW") promotion to attract subscribers. See id. at 594 ¶ 5 (NCUC Order). Under the LCCW promotion, BellSouth waived the line connection charge for new residential customers who purchased basic service and at least two custom calling features. See id. at 190.[2] These features

---

[1] The parties manually filed the record from the proceedings before the NCUC. Cites to the agency record are "R. at __."

[2] The promotion reads in part:

**Promotion Specifics:**
Specific Features of this promotion are as follows:
Waived line connection charge to reacquisition or winover residential customers who currently are not using BellSouth for local service and who purchase BellSouth® Complete Choice® service, BellSouth® PreferredPack℠ service, or basic service and two (2) features will be waived.

**Restrictions/Eligibility Requirements:**
. . .
The customer must switch their local service to BellSouth and purchase any one of the following: BellSouth® Complete Choice® plan, BellSouth® PreferredPack℠ plan, or BellSouth® basic service and two (2) custom calling (or Touchstar® service) local features.

R. at 190.

included call return, repeat dialing, and call tracing. See id. at 191-93 ("Definitions of Feature Offerings" in BellSouth General Subscriber Service Tariff). BellSouth allowed its customers to block these features on a per use basis without charge. Id.

Under BellSouth's procedures, CLECs must pay the wholesale price for services and then apply for any promotional credits – including the LCCW promotional credit – to which they are entitled. See Compl. ¶ 12. dPi purchased basic service from BellSouth and instructed BellSouth to block all features that customers could use on a charge-per-use basis, including call return, repeat dialing, and call tracing. Id. dPi wanted these features blocked because dPi sells pre-paid phone services to "non-credit worthy" customers. Mem. in Supp. of Pl.'s Mot. for Summ. J. 16. If dPi did not block features that result in a per-use charge, dPi's customers could use the feature and thereby incur an expense. dPi would have difficulty recouping that expense because it sells pre-paid phone services and does not bill customers after-the-fact for such charges. Essentially, dPi blocks features that could result in a per-use charge in order to make more money. See Commissioners' Mem. in Resp. to Pl.'s Mot. for Summ. J. 2-3.

BellSouth added the feature blocks – call return block ("BCR"), repeat dialing block ("BRD"), and call tracing block ("HBG") – at no charge to dPi. dPi then resold the basic service with the feature blocks to its customers as a single pre-paid package. See Compl. ¶¶ 15, 17. dPi applied for the LCCW promotional credit on these resales, but BellSouth denied dPi's applications on resales in which dPi's customers did not purchase basic service and two or more features other than the feature blocks. See id. ¶ 17.

On August 25, 2005, plaintiff filed a complaint against BellSouth with the NCUC. R. at 1-5. Following an evidentiary hearing, the NCUC dismissed the complaint on June 7, 2006. Id. at 592-600. The NCUC concluded that:

> dPi urges the Commission to intervene in this dispute to divine the "proper" meaning of the promotion and require BellSouth to pay the appropriate credits. Were it to do so, the Commission would resort to various judicially acknowledged rules to assist it in interpreting the promotion. However, after careful consideration,

3

the Commission concludes that we are not required to analyze and decide this case based on the language of the promotion. The fact is that BellSouth and dPi jointly agreed to methodology for determining the limits of any promotion in their voluntarily negotiated interconnection agreement. The following language governs this Commission's interpretation of this promotion:

> "Where available for resale, promotions will be made available only to End Users who would have qualified for the promotion had it been provided by BellSouth directly." [citation omitted].

Under the clear language of this provision, promotions are *only* available to the extent that end users would have qualified for the promotion if the promotion had been provided by BellSouth directly. In [BellSouth] Witness Tipton's testimony, she stated emphatically that BellSouth does not authorize promotional discounts to its End Users who only order basic services and the blocks provided by dPi. [citation omitted]. This fact was uncontested by dPi at the hearing and unrebutted in its post hearing brief. The Commission assumes that, if dPi had any contradictory evidence, it would have brought that evidence to our attention. This fact is dispositive. Under the clear terms of the interconnection agreement and the facts of this case, dPi end users who only order blocking features are *not* eligible for the credits because similarly situated BellSouth End Users are not entitled to such credits. dPi's complaint should therefore be denied.

Id. at 598 (emphasis in original).

On July 6, 2006, plaintiff filed a motion for reconsideration. See id. at 601-10. After a full briefing, the NCUC denied the motion for reconsideration on October 12, 2006. See id. at 632-38. The NCUC found plaintiff's arguments on the motion for reconsideration to be "identical" to its earlier assertions before the NCUC and held that "nothing in the record suggests that BellSouth applies the promotional language in any manner other than that described by BellSouth's witness." Id. at 637.

On November 11, 2006, plaintiff filed a complaint in this court against BellSouth and the individual members of the NCUC in their official capacities. Plaintiff seeks a declaration that the NCUC order is contrary to the 1996 Act and that plaintiff is entitled to the LCCW promotional credits. See Compl., Prayer for Relief ¶ 1. On January 8, 2007, the Commissioners filed a motion to dismiss the complaint for lack of subject matter jurisdiction. BellSouth did not join in the motion to dismiss. On May 4, 2007, plaintiff, the Commissioners, and BellSouth filed motions for summary judgment. On September 12, 2007, the court heard oral argument on all motions.

4

II.

The Commissioners argue that the court lacks subject matter jurisdiction because plaintiff's complaint does not raise a federal question. Plaintiff responds that jurisdiction is proper under 47 U.S.C. § 252(e)(6) or 28 U.S.C. § 1331. See Verizon Md., 535 U.S. at 642 ("[E]ven if § 252(e)(6) does not <u>confer</u> jurisdiction, it at least does not <u>divest</u> district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law.").

A.

In order to resolve the jurisdictional issue, the court first analyzes the recent decisions from the Fourth Circuit and United States Supreme Court concerning jurisdiction and the 1996 Act. As the Supreme Court has noted, "[i]t would be [a] gross understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 397 (1999).

In Bell Atlantic Md., Inc. v. MCI WorldCom, Inc., 240 F.3d 279 (4th Cir. 2001) rev'd by, Verizon Md., 535 U.S. at 648, the Fourth Circuit considered whether federal jurisdiction existed over an order of the Maryland Public Service Commission ("MPSC") that determined that calls to Internet service providers ("ISPs") qualified as "Local Traffic" under the parties' interconnection agreement and thereby required payment of "reciprocal compensation" under section 251(b)(5) of the 1996 Act. The CLEC in the case filed a complaint with the MPSC, arguing that calls to ISPs were not "local traffic." The CLEC relied on a recent ruling by the Federal Communications Commission ("FCC") that classified ISP-bound calls as non-local calls that do not qualify for reciprocal compensation under 47 U.S.C. § 251(b)(5). Id. at 285-86. Despite the FCC ruling, the MPSC held that as a matter of state contract law, the parties in their interconnection agreement had agreed to treat ISP-bound calls as local traffic subject to reciprocal compensation. Id. The CLEC challenged the MPSC ruling in federal court, but the district court dismissed the action for lack of subject matter jurisdiction. Id. at 286-87.

On appeal, the Fourth Circuit held that section 252(e)(6) does not confer jurisdiction over state commission decisions interpreting or enforcing interconnection agreements. Id. at 301-07. Instead, the scope of jurisdiction created by section 252(e)(6) is limited to "determinations" made by state commissions under section 252, i.e., whether an interconnection agreement complies with the requirements of sections 251 and 252. Id. at 304. The Fourth Circuit held that "[w]hile this federal jurisdictional provision authorizes review of § 252 arbitration determinations ultimately leading to the formation of interconnection agreements, in the final analysis, the State commission determinations under § 252 involve only approval or rejection of such agreements." Id. at 302-03. According to the Fourth Circuit, federal review of negotiated interconnection agreements is even narrower because there the "only 'determination' that can be made by the State commission . . . is a determination to approve or reject it, and when the agreement is approved by the State commission, then there is a question whether there can be any 'party aggrieved' to seek review in federal court." Id. at 303. The Fourth Circuit stated that any determination by a state commission that was not a section 252 determination could only be reviewed pursuant to state law. Id. Further, the Fourth Circuit concluded that the general grant of jurisdiction in 28 U.S.C. § 1331 could not be used to override Congress' limited grant of federal jurisdiction in section 252(e)(6). Id. at 307-09.

The Supreme Court reversed the Fourth Circuit in Verizon Maryland, holding that section 252(e)(6) did not strip federal courts of jurisdiction they would otherwise have under section 1331. Verizon Md., 535 U.S. at 641-44. The Supreme Court found that the CLEC had brought a straightforward federal preemption claim:

> Verizon alleged in its complaint that the Commission violated the Act and the FCC ruling when it ordered payment of reciprocal compensation for ISP-bound calls. Verizon sought a declaratory judgment that the Commission's order was unlawful, and an injunction prohibiting its enforcement. We have no doubt that federal courts have jurisdiction under § 1331 to entertain such a suit. Verizon seeks relief from the Commission's order on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, and its claim thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

6

Id. at 642 (quotation omitted). Thus, section 1331 provided a basis for jurisdiction over the CLEC's claim that the MPSC's order was preempted by the FCC ruling. Id. at 643. The Supreme Court expressly declined to decide whether section 252(c)(6) provided an independent basis for jurisdiction over a state commission decision interpreting or enforcing an interconnection agreement. Id. at 642 ("Whether the text of § 252(e)(6) can be so construed is a question we need not decide."). The Supreme Court remanded the case to the Fourth Circuit. Id. at 648.

On remand to the district court, the CLEC filed an amended complaint. See Verizon Md., Inc. v. Global NAPs, Inc., 377 F.3d 355, 361 (4th Cir. 2004) ("Global NAPs"). Count I alleged that the MPSC's order violated federal law and the interconnection agreement. Count II alleged that the MPSC lacked authority to require reciprocal compensation in arbitration proceedings. Id. The district court recognized its jurisdiction over the "garden-variety federal preemption claim" in Count II, found that the MPSC possessed authority to require reciprocal compensation in arbitration proceedings, and awarded summary judgment on Count II to the defendants. Id. at 362.

Regarding Count I, the district court found that the CLEC "was actually asserting two distinct claims: first, that the [M]PSC's interpretation of the interconnection agreement violated federal law; and second, that the [M]PSC's interpretation violated the parties' intent as reflected in the [interconnection] agreement." Id. The district court took jurisdiction over the first claim in Count I and awarded summary judgment to the defendants. As for the second claim in Count I, the district court found that neither section 252(e)(6) nor section 1331 conferred jurisdiction. The district court construed the second claim as a state-law contract claim arising under state law and declined to exercise supplemental jurisdiction over it. Id.

The CLEC appealed. In Global NAPs, the Fourth Circuit held that there was jurisdiction under section 1331 over the second claim in Count I alleging that the MPSC misinterpreted the interconnection agreement. Id. at 363. The Fourth Circuit found that the misinterpretation claim raised a requisite "substantial question of federal law" for four reasons:

(1) [the] complaint alleges that the [M]PSC misinterpreted interconnection agreement provisions that incorporate federal law, (2) the agreement interpreted is federally mandated, (3) the contractual duty at issue is imposed by federal law, and (4) the purpose of the 1996 Act is best served by allowing review of the [M]PSC's order in the district court.

Id. at 366. The Fourth Circuit stated that a federal question exists "when there is a claim that a state utility commission has misinterpreted an interconnection agreement provision that implements a duty imposed by the Act." Id. The Fourth Circuit cautioned, however, that it was "not saying that every dispute about a term in an interconnection agreement belongs in federal court, but when the contractual dispute . . . involves one of the 1996 Act's essential duties, there is a federal question." Id.; accord Puerto Rico Tel. Co. v. Telecomms. Regulatory Bd., 189 F.3d 1, 11-14 (1st Cir. 1999). Moreover, because federal question jurisdiction existed under 28 U.S.C. § 1331 to review the order of the MPSC, the Fourth Circuit "decline[d] to decide whether jurisdiction could be grounded independently on 47 U.S.C. § 252(e)(6)." Global NAPs, 377 F.3d at 366 n.2.

B.

In light of Verizon Maryland and Global NAPs, the court initially addresses jurisdiction under 28 U.S.C § 1331. As mentioned, in Global NAPs, the court concluded that plaintiff's complaint raised a substantial question of federal law under 28 U.S.C § 1331 for four reasons: (1) plaintiff's complaint alleged that the state commission "misinterpreted interconnection agreement provisions that incorporate federal law"; (2) "the agreement interpreted is federally mandated"; (3) "the contractual duty at issue is imposed by federal law"; and (4) "the purpose of the 1996 Act is best served by allowing review of the [state commission's] order in the district court." Global NAPs, 377 F.3d at 366.

1.

The first Global NAPs factor is whether the complaint alleges that the state commission misinterpreted an interconnection agreement provision that incorporates federal law. Id. Plaintiff's complaint alleges that the NCUC misinterpreted a provision in dPi's interconnection agreement with

BellSouth that incorporates federal law and thereby erroneously denied dPi promotional credits. See Compl. ¶¶ 2, 20-23; Prayer for Relief; cf. Global NAPs, 377 F.3d at 363. Specifically, the interconnection agreement states that "[w]here available for resale, promotions will be made available only to End Users who would have qualified for the promotion had it been provided by BellSouth directly." R. at 222. This provision is derived from BellSouth's obligation to resell its services at wholesale rates to CLECs under section 251(c)(4)(A). See 47 U.S.C. § 251(c)(4)(A). This provision also corresponds to an FCC regulation that establishes permissible restrictions on reselling. See 47 C.F.R. § 51.613(a)(1).[3] The NCUC relied on this provision in the interconnection agreement and Tipton's testimony at the hearing concerning the LCCW promotion to deny dPi's claim for promotional credits. Thus, the first Global NAPs factor supports jurisdiction.

2.

The second Global NAPs factor is whether the state commission interpreted an

---

[3] 47 C.F.R § 51.613(a) states:

a) Notwithstanding § 51.605(b), the following types of restrictions on resale may be imposed:

(1) Cross-class selling. A state commission may permit an incumbent LEC to prohibit a requesting telecommunications carrier that purchases at wholesale rates for resale, telecommunications services that the incumbent LEC makes available only to residential customers or to a limited class of residential customers, from offering such services to classes of customers that are not eligible to subscribe to such services from the incumbent LEC.

(2) Short term promotions. An incumbent LEC shall apply the wholesale discount to the ordinary rate for a retail service rather than a special promotional rate only if:

(i) Such promotions involve rates that will be in effect for no more than 90 days; and

(ii) The incumbent LEC does not use such promotional offerings to evade the wholesale rate obligation, for example by making available a sequential series of 90-day promotional rates.

47 C.F.R. § 51.613(a).

interconnection agreement that is federally mandated. See Global NAPs, 377 F.3d at 366. At oral argument, the Commissioners conceded that the NCUC interpreted an interconnection agreement between plaintiff and BellSouth that is federally mandated. The court agrees. The interconnection agreement implements the 1996 Act's resale obligation in section 251(c)(4)(A) and 252(b)(3). This obligation, like the reciprocal compensation provision in section 251(b)(5), is an essential duty under the 1996 Act. See, e.g., Global NAPs, 377 F.3d at 364. Thus, the second Global NAPs factor supports jurisdiction.

3.

The third Global NAPs factor is whether "the contractual duty at issue is imposed by federal law...." Global NAPs, 377 F.3d at 366. At oral argument, plaintiff explained that under its theory of the case, the "contract" at issue in this case consists of three distinct documents: the promotion that BellSouth unilaterally promulgated, the tariffs that BellSouth submitted to the NCUC, and the interconnection agreement between dPi and BellSouth. According to plaintiff, the promotion and the tariff contractually establish "the contractual duty at issue" in the case (i.e., the duty to pay the LCCW promotional credits). Further, plaintiff contends that the NCUC erroneously concluded that the interconnection agreement negates this alleged "duty" to pay the LCCW promotional credits. The defendants disagree with dPi. According to the defendants, the interconnection agreement provides the methodology for determining the "contractual duty at issue" with respect to any promotional credits that dPi seeks from BellSouth, including the LCCW promotional credits. Moreover, according to defendants, the interconnection agreement coupled with Tipton's testimony doom dPi's request for the LCCW promotional credits.

The parties agree that the scope of the "contractual duty at issue" in this case involves (at its broadest level) BellSouth's duties under section 251(c)(4)(A) and section 252(b)(3) and involves the interpretation of a federally mandated interconnection agreement. The interconnection agreement is the vehicle that Congress chose "to implement the duties imposed in § 251." Id. at 364.

10

Resolving the parties' dispute about the LCCW promotional credits turns on whether the NCUC's implicit premise is correct: the parties must abide by the unambiguous terms of their interconnection agreement once a state commission approves the agreement under section 252(e)(1). Stated differently, the NCUC concluded that an unambiguous contractual duty in the interconnection agreement controlled the resolution of this dispute about the LCCW promotion. In light of this conclusion, the third Global NAPs factor supports jurisdiction. Cf. Nuvox Commc'ns, Inc. v. N.C. Utils. Comm'n, 409 F. Supp. 2d. 660, 664-65 (E.D.N.C. 2006) (holding dispute about audit requirements in an interconnection agreement did not present a substantial federal question), vacated on other grounds, 2007 WL 2038942 (4th Cir. July 12, 2007) (per curiam) (unpublished).

4.

Finally, the court must determine whether the purpose of the 1996 Act is best served by allowing federal review of the NCUC order. See Global NAPs, 377 F.3d at 365. The 1996 Act "took the regulation of local telephone service away from the States and established a new federal regime designed to promote competition." Id. (quotation omitted) (emphasis omitted). At the same time, the 1996 Act preserved the authority of state utility commissions and courts to interpret and enforce contracts that do not raise a substantial question of federal law. See id. In fact, the FCC carved out a state role in policing ILEC's resale obligations with respect to promotions:

> We are concerned that conditions that attach to promotions and discounts could be used to avoid the resale obligation to the detriment of competition. Allowing certain incumbent LEC end user restrictions to be made automatically binding on reseller end users could further exacerbate the potential anticompetitive effects. We recognize, however, that there may be reasonable restrictions on promotions and discounts. We conclude that the substance and specificity of rules concerning which discount and promotion restrictions may be applied to resellers in marketing their services to end users is a decision best left to state commissions, which are more familiar with the particular business practices of their incumbent LECs and local market conditions. These rules are to be developed, as necessary, for use in the arbitration process under section 252.

In re Implementation of the Local Competition Provisions of the Telecomm. Act of 1996, 11 F.C.C.R. 15,499 ¶ 952 (1996) (First Report and Order). Nevertheless, in Global NAPs, the Fourth

11

Circuit stated that "when there is a claim that a state utility commission has misinterpreted an interconnection agreement provision that implements a duty imposed by the Act, review should be available under § 1331 in district court." Global NAPs, 377 F.3d at 366. Because plaintiff's complaint essentially contends that the NCUC misinterpreted an interconnection agreement provision that implements a duty imposed under 47 U.S.C. § 251(c)(4)(A), the court concludes that the fourth Global NAPs factor supports jurisdiction.

Accordingly, the court concludes that it has jurisdiction under 28 U.S.C. § 1331 to review the NCUC decision. In light of this conclusion, the court does not address whether jurisdiction exists under 47 U.S.C. § 252(e)(6). Cf. BellSouth Telecomms., 494 F.3d at 444-45 (finding jurisdiction under section 252(e)(6) to consider BellSouth's challenge to an NCUC decision holding that an ILEC's incentive offers to subscribers created a promotional retail rate that must be offered to CLECs under section 251(c)(4)).

### III.

Next, the court considers the parties' motions for summary judgment. Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56. The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn from the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369

12

Case 5:06-cv-00463-D   Document 52   Filed 09/25/07   Page 12 of 17

U.S. 654, 655 (1962) (per curiam).

The court reviews de novo the NCUC's interpretations of the 1996 Act. GTE South, Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. 1999). However, the court does not "sit as a super public utilities commission." Id. Thus, the court reviews the NCUC's fact findings for substantial evidence. Id. Under the substantial evidence standard, the "court is not free to substitute its judgment for the agency's . . . ; it must uphold a decision that has substantial support in the record as a whole even if it might have decided differently as an original matter." Id. at 746 (quotations omitted).

In support of its motion for summary judgment, plaintiff argues that it qualifies for the LCCW promotion under the express terms of the promotion. The LCCW promotion states that customers are eligible for the promotion if they "purchase . . . BellSouth® basic service and two (2) custom calling (or Touchstar® service) local features." R. at 190. In the transactions at issue, dPi purchased basic service at wholesale pricing from BellSouth, instructed BellSouth to block charge-per-use features, and resold the service as a pre-paid package to customers. Plaintiff asserts that these blocks of Touchstar features – BCR, BRD, HBG – are themselves Touchstar features that, added to the purchase of basic service, entitle dPi to the LCCW promotion. In support of this argument, plaintiff notes that BCR, BRD, and HBG are described as features in the rates and charges section of the Touchstar tariff. See id. at 199.

BellSouth responds that the NCUC correctly interpreted the interconnection agreement. Additionally, BellSouth argues that regardless of whether the blocks are "features," plaintiff does not qualify under the terms of the LCCW promotion because plaintiff merely took, and did not purchase, the blocks with the basic service. Similarly, BellSouth notes that plaintiff's customers did not purchase or order the blocking features separately, but assumed them without cost or knowledge of as part of plaintiff's uniform package service. Plaintiff counters that the test is not whether plaintiff or its customers actually purchased the features, but whether a BellSouth customer would

13

have qualified for the promotion by purchasing basic service with two blocking features as a package. Plaintiff concedes that "it is doubtful that ANY of BellSouth's customers would have ordered service this way, as that would be extremely atypical for the kinds of customers BellSouth serves – which almost by definition are not the kinds of non-credit worthy customers dPi serves." Mem. in Support of Pl.'s Mot. for Summ. J. 16. Nevertheless, according to dPi, "all that matters is that dPi has qualified under the written terms of the promotion – by purchasing the combination of basic local service with two or more Touchstar blocks." Id. at 17.

The NCUC declined to analyze the tariff or "to analyze and decide this case based on the language of the promotion." R. at 598. In so doing, it refused to resolve whether – under the language of the promotion itself – a customer who took, as opposed to purchased, two or more features with basic service qualified for the LCCW promotion. The NCUC also left unanswered how the alleged ambiguity in the tariff's language impacted the dispute about the LCCW promotion between dPi and BellSouth. Instead, the NCUC concluded that it initially needed to examine the "voluntarily negotiated interpretative aid found in the interconnection agreement." See id. at 599. If an unambiguous provision in the interconnection agreement resolved the dispute about the LCCW promotion, that was the end of the matter. The NCUC then examined the interconnection agreement, which states "[w]here available for resale, promotions will be made available only to End Users who would have qualified for the promotion had it been provided by BellSouth directly." Id. at 594 ¶ 8. The NCUC then reviewed the evidence in light of this provision in the interconnection agreement and found that "[u]nder the <u>clear</u> <u>terms</u> of the interconnection agreement and the facts of this case, dPi end users who only order blocking features are <u>not</u> eligible for the credits because similarly situated BellSouth End Users are not entitled to such credits." Id. at 598 (emphasis added).

Implicitly, the NCUC concluded that if the parties enter into an interconnection agreement concerning the duties owed under section 251 and a state commission approves that agreement, then an unambiguous provision in the interconnection agreement is binding in resolving disputes about

14

the parties' duties under section 251. Hence, this court must determine whether the NCUC's conclusion concerning the legal effect of the parties' interconnection agreement is correct.

This court need not look far to conclude that the NCUC correctly viewed the legal effect of the parties' interconnection agreement. In Global NAPs, the Fourth Circuit stated:

> If the parties enter into an agreement by voluntary negotiation, they may agree "without regard to the standards set forth" in § 251(b) and § 251(c). [47 U.S.C.] § 252(a)(1). They must still, however, spell out how they will fulfill the duties imposed by § 251. See id. § 251(c)(1). When an agreement, like the one voluntarily negotiated by Verizon and MCI, is submitted to the state commission for approval, the commission may reject it only if it discriminates against a carrier not a party, or it is not consistent with "the public interest, convenience, and necessity." Id. § 252(e)(2)(A). Once the agreement is approved, the 1996 Act requires the parties to abide by its terms. See §§ 251(b)-(c).
>
> Interconnection agreements are thus the vehicles chosen by Congress to implement the duties imposed in § 251. They are, in short, federally mandated agreements, and "[t]o the extent [an agreement] imposes a duty consistent with the Act . . . that duty is a federal requirement."

Global NAPs, 377 F.3d at 364; see also Cavalier Tel., LLC v. Verizon Va. Inc., 208 F. Supp. 2d 608, 618 (E.D. Va. 2002), aff'd, 330 F.3d 176 (4th Cir. 2003); accord Connect Commc'ns Corp. v. Southwestern Bell Tel., L.P., 467 F.3d 703, 708-09 (8th Cir. 2006); Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc., 323 F.3d 348, 357 (6th Cir. 2003); Southwestern Bell Tel. Co. v. Pub. Util. Comm'n, 208 F.3d 475, 485-87 (5th Cir. 2000).

Because the NCUC properly looked first to the interconnection agreement to resolve dPi and BellSouth's dispute about the LCCW promotion, the court next analyzes whether substantial evidence supports the NCUC's interpretation of the interconnection agreement vis-à-vis the evidence. See, e.g., Morrison, 199 F.3d at 745-46. The NCUC found that in order to receive the LCCW promotional credit, the interconnection agreement required dPi to show that similarly situated BellSouth customers would have qualified for the LCCW promotional credit. See R. at 598. As evidence to support this finding, the NCUC cited the testimony of a BellSouth witness, Pam Tipton. Tipton testified that BellSouth "<u>does not authorize</u> promotional discounts to its End

15

Users who only order basic services and the blocks provided by dPi." Id. (emphasis added). The NCUC relied on this testimony and found that "similarly situated BellSouth End Users are not entitled to such credits." Id. (emphasis added). Accordingly, in light of the clear terms in the interconnection agreement, the NCUC concluded that dPi is not entitled to such credits. Id.

In opposition to this conclusion, plaintiff argues that "Tipton's testimony is the least reliable evidence in the record and would never have been admissible in a court of law." Mem. in Support of Pl.'s Mot. for Summ. J. 16. Tipton, a director in BellSouth's regulatory department, did not review, approve, or deny applications for LCCW credits for BellSouth before the complaint was filed. However, Tipton personally reviewed all of dPi's applications in preparation for testifying before the NCUC on behalf of BellSouth. At the hearing, the presiding Commissioner overruled dPi's objection to the admissibility of Tipton's testimony. The presiding Commissioner held that dPi's objection went to the weight of Tipton's testimony and was properly dealt with on cross examination. Tipton testified that BellSouth required customers to purchase basic service and two or more paying features to qualify for the LCCW promotion. The NCUC noted that "[t]his fact was uncontested by plaintiff at the hearing and unrebutted in its post hearing brief." R. at 598. The NCUC was entitled to credit Tipton's testimony regarding BellSouth's administration of the LCCW promotion and to interpret the interconnection agreement to bar dPi's receipt of the LCCW credits. Under the substantial evidence standard, the court cannot substitute its judgment for that of the NCUC. See Morrison, 199 F.3d at 745-46. In light of the language in the interconnection agreement and the evidence at the NCUC hearing, defendants are entitled to summary judgment.

IV.

For the reasons stated above, the Commissioners' motion to dismiss for lack of subject matter jurisdiction is DENIED. The Commissioners' and BellSouth's motions for summary judgment are GRANTED, and plaintiff's motion for summary judgment is DENIED. The Clerk is DIRECTED to close the case.

SO ORDERED. This 25 day of September 2007.

                                                     JAMES C. DEVER III
                                                     United States District Judge